FILED
KENNETH J. MURPHY
CLERK
FEB -3  T.T.
03 JAN 34 PM 2:39

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Theresa Neely,            )
                          )
         Plaintiff,       )  Case No. C-1-98-356
                          )
    vs.                   )
                          )
Miller Brewing Company,   )
    et al.,               )
                          )
         Defendants.      )

> Kappler v. Givaudan Flavors
> 1:01-CV-630
> Defendant's Motion in Limine
> re: Plaintiff's Expert Witness
> **Exhibit C**

Order Excluding Expert

This matter is scheduled for trial on February 24, 2003, on Plaintiff's claims of race discrimination and retaliation under Ohio law and 42 U.S.C. §1981. Plaintiff proposes to introduce the testimony of Anne Veneziano, an attorney and licensed social worker, as an expert on the issue of Plaintiff's alleged psychological injury. Ms. Veneziano, purporting to testify as a social worker and not as an attorney, opines that Plaintiff suffered post-traumatic stress disorder ("PTSD") when she evaluated Ms. Neely in January 1999. Defendant asks the Court to exclude Ms. Veneziano as a witness.

1. Background

Plaintiff has been employed by Defendant Miller Brewing Company in various capacities since she was hired on February 29, 1995. On March 8, 1996, while working as a labeler on Miller's

76

B-8 bottling line, Plaintiff suffered a work-related back injury. Nevertheless, she continued to work and re-injured her back five days later. As a result of this second injury, Plaintiff remained off work until March 18, 1996. Upon her return, she advised Peggy Spina, Miller's Human Resources representative, that she was still in significant pain. When Plaintiff went to see her doctor shortly thereafter, he directed her to stay home until March 26, 1996.

At that time, Plaintiff sought to return to work. However, Spina informed her that she could not return due to her physical condition and the medications she was taking. Plaintiff had also requested, in the alternative, a light duty assignment. Spina informed her that none were then available. According to Plaintiff, however, her work team on the B-8 line had identified a light duty need to input certain information into the computer. Mike Malone, Plaintiff's supervisor, allegedly overrode the team's recommendation on the need for light duty, thereby preventing Plaintiff from returning to work at that time. She claims that Defendant Miller discriminatorily denied her the opportunity to work on a light duty assignment and allowed white employees to do so after being injured.

Nevertheless, Plaintiff was later instructed by her doctor not to return to work until April 23, 1996. Upon examination on that date, he referred Plaintiff to another

2

physician specializing in back injuries and certified that she was not to return to work until May 3, 1996. The specialist released Plaintiff to return to work on light duty with lifting, bending, and standing restrictions. However, Plaintiff was again told by Spina that she could not return to work at that time due to her physical limitations and the medications she was taking. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 10, 1996, asserting that she was treated less favorably than other similarly-situated non-protected employees.

      Pursuant to the recommendation of her doctor and Miller's company nurse, Plaintiff participated in a work hardening program. Upon completion of the program, Plaintiff was permitted to return to work with restrictions on September 3, 1996. She was asked by Health Services to complete re-hire paperwork and to be examined by a company physician upon her return, something Defendant claims was a routine procedure for all employees returning from injury leave. In her first week back to work, Plaintiff also was observed closely in the performance of her job by the company nurse, who took notes on her performance. When she was denied overtime, Plaintiff filed a second charge of race discrimination with the EEOC, dated September 25, 1996, alleging retaliation.

Plaintiff claims the discrimination continued in the form of a hostile work environment despite her complaints. She cites the company nurse's close observation, two discriminatory remarks by co-workers, a racial remark by her supervisor, false accusations by co-workers and several instances of vandalism in support of her claim. Based on these allegations, Plaintiff filed a third charge of race discrimination and retaliation with the EEOC on April 8, 1997.

On May 25, 1998, Plaintiff filed this action seeking relief for discrimination and retaliation on the basis of race and gender in violation of Title VII and §1981, as well as for intentional infliction of emotional distress. Defendants moved for summary judgment on each of Plaintiff's claims, asserting among other things that her Title VII claims were untimely. Plaintiff abandoned her claims of gender discrimination and moved for leave to amend the complaint to assert claims of race discrimination and retaliation under state law. The Court permitted the amendment and concluded that Plaintiff's claims under Title VII were untimely. The remaining claims are for race discrimination and retaliation in violation of Ohio law and 42 U.S.C. §1981.

2. <u>Ms. Veneziano's Proposed Testimony</u>

Ms. Veneziano begins her report by stating that she examined Plaintiff "to determine the emotional effects upon her, if any, of having to confront both sexual and racial discrimination in the workplace." She sets forth in detail Plaintiff's allegations regarding her back injury and her physician's assessment that she was able to return to work on light duty. She recounts Plaintiff's allegation that her work team refused to allow her to return to work, even though white employees had been permitted to return on light duty after injuries. She also restates Plaintiff's allegation that she was touched inappropriately on her breasts and buttocks by an instructor from an outside company that manufactured a piece of equipment on which Plaintiff was being trained. The instructor was fired a few days later.

Following that recitation of background information, very little of which relates to Plaintiff's racial discrimination and retaliation claims, Ms. Veneziano states the following opinion:

> Ms. Neely is an intelligent and highly resourceful
> woman who is fortunate to have the inner fortitude to
> protect her from the outrageous liberties which have
> been taken by her employers. She has suffered [sic]
> variety of affronts: first, the refusal of Ms. Kay
> Moses, "safety starpoint," to write up an accident
> report despite Ms. Neely's injury defies comprehension.

5

Fortunately, Mr. Ellicott used better judgment and initiated the writing of the report. This act, while beneficial to Ms. Neely, underscores a fundamental problem at Miller: there appears to be a complete lack of parity within the system. Each autonomous "team" operates according to completely idiosyncratic criteria. As a result, some workers benefit and others suffer.

Another affront included Ms. Neely having suffered sexual harassment by the "instructor" at Koron who squeezed her buttocks and breasts. His act was condoned both expressly and by default: it was condoned expressly by the co-workers' exclamations that Ms. Neely had a good day as a result of having her body squeezed! It was condoned by default by the complete lack of regard for her welfare which was exhibited by her co-workers as well as by the disrespectful conduct by another which they tolerated as though such conduct met some reasonable standard of decorum.

Ms. Neely's co-workers and superiors have, unfortunately, all come together to "blame the victim," a phenomenon which is all too familiar among rape victims. Sometimes, however, this conduct is also evidenced by a group of people who have tacitly agreed to compromise their principles. If this occurs, then when an individual like Ms. Neely comes forward and protests inequities, others who are motivated to maintain the status quo scapegoat her.

Ms. Neely has suffered racial indignities: In 1998 [sic] it is sad to recognize that African-Americans are still called "nigger" in this society. It is incongruous that such conduct occurs at a world-renown [sic] brewery whose product has diverse, if not universal, appeal. Nevertheless, the affronts which she endured included but were not limited to the following: the refusal to allow her to return to work on light duty when caucasian employees were permitted to do so; the reference to her both as a "nigger" and a "nigger-bitch."

It is essential not to be misled by Ms. Neely's strength, determination and sense of justice. Ms. Neely has been seriously and, perhaps irrevocably harmed by the shameless conduct to which she was subjected. A woman of less strength might have

6

required psychiatric hospitalization. Ms. Neely was subjected to degradation, humiliation and fear for her life all in addition to the racism and sexual harassment to which she was subjected and all for seeking fairness in her place of employment.

Ms. Neely meets the requirements for **Posttraumatic Stress Disorder, DSM IV 309.81.** Unlike most people who meet a preponderance of the criteria for this disorder, Ms. Neely meets **all** the criteria. She meets the criteria for the following reasons: first, she was subjected to events which compromised her physical integrity and which threatened serious injury. These events included making her enter a dangerous machine in order to "fix" it when she had never been given proper instruction; being subjected to having her buttocks and breasts squeezed (a battery) by someone in authority; having her tires slashed; and being called "nigger." All these events coalesced to make her feel threatened, unprotected, and devalued. Understandably she also felt fearful and horrified.

Second, Ms. Neely reexperiences the traumas in her workplace via recurrent and intrusive distressing recollections of the events. She relives the inequities on a daily basis, she dreams of being raped and of having co-workers taunt her and tell her that she invited it. And make no mistake about it - Ms. Neely has been raped - of her ideals, of her trust in others and of her ability to obtain pleasure from her life. Further, she continues to act or feel as though the trauma recurs and experiences intense psychological distress at exposure to internal or external cues which symbolize or resemble an aspect of the traumatic events.

Third, Ms. Neely persistently avoids stimuli associated with the trauma. She makes a concerted effort to avoid thoughts, feelings or conversation associated with the trauma; she feels detached or estranged from others; her sexual functioning with her partner has been impaired as a result of her preoccupation, depression and anxiety about the trauma. In addition, she feels a markedly diminished interest in socializing, in sexual activity and is simply unable to have fun.

Fourth, Ms. Neely has difficultly sleeping and requires prescription medication to assist her in obtaining

7

rest. Her concentration has been adversely affected and she is hypervigilant as she works each day with a strong sense of foreboding. The duration of her disturbance has been in excess of six months and her life has been irrevocably altered.

This evaluator proposes two key **recommendations**: first, despite Ms. Neely's health and resilience, she should be in therapy with a professional who functions independently of the Miller Brewing Company. I would recommend someone from the Department of Psychiatry, Psychology or Social Work at the University of Cincinnati. She should be seen on a regular basis in order to work through the traumas to which she has been subjected and to help her to regain her sense of trust and her ability to obtain pleasure from life.

Second, she should quit her job. No one should have to work in an environment where rules are arbitrarily defined and capriciously enforced, where denigration of others is tolerated and where sexual, racial and other personal liberties are freely taken by those who are in a position of power vis a vis their victims. Ms. Neely has sufficient internal and intellectual resources that will enable her to succeed in any other occupation or profession to which she directs her attention. She deserves to succeed and if she has the proper therapy which will enable her to put the Miller Brewing Company behind her, I am optimistic about her future. If she fails to obtain the health care she requires, however, I fear that her intimate relationships will continue to be impaired, her distrust of others will worsen and her self-esteem may be irrevocable eroded.

3. <u>Defendant's Arguments in Favor of Exclusion</u>

Defendant attacks Ms. Veneziano's proposed testimony on four bases: (1) Ms. Veneziano makes legal and factual determinations and attempts to usurp the Court's power to instruct the jury as to the law; (2) she relies upon incorrect facts or upon facts and allegations that will not be before the

8

jury; (3) her report contains inflammatory and unfairly prejudicial statements; and (4) her report contains statements that are not relevant to the issues in this case.

Plaintiff does not suggest that the proposed expert be permitted to instruct the jury as to the law or to make legal and factual determinations for the jury. Basis (1) for Defendant's motion to exclude goes to the proper manner of testifying for an expert witness. Plaintiff's counsel is aware, and may be reminded, of the proper method for examining an expert. The witness, an attorney, may be reminded of her role and of the limitation of her testimony to her professional opinion, as a social worker, about any injury Plaintiff may have suffered. While Ms. Veneziano's report does contain factual and legal determinations, she need not be permitted to repeat those determinations at trial, and their inclusion in the report is not, independently, a bar to her testifying.

The same is true of the inflammatory and unfairly prejudicial statements in her report. Basis (3) above goes to the inclusion of the expert's philosophical and political views in the report, thinly disguised as opinion about Plaintiff's injuries. The witness need not be permitted to repeat at trial every statement included in her report. The inclusion of such statements in the report is not a bar to the witness' testifying at trial. The witness and Plaintiff's counsel may be instructed

9

accordingly, particularly with regard to the witness' statements about rape, which is not alleged in this case and has a precise legal definition that bears little resemblance to the definition used by Ms. Veneziano.

A similar analysis applies to basis (4) above, which relates to statements in the report that are irrelevant to the issues to be tried. Ms. Veneziano's report includes references to sexual harassment that are not germane to her race discrimination and retaliation claims. The same is true with respect to statements about the manner in which Plaintiff suffered her back injuries and the initial response to those injuries. Plaintiff has not alleged that the unsatisfactory immediate response was racially motivated. The inclusion of statements about those matters is not an independent basis for excluding Ms. Veneziano's testimony altogether.

Basis (2) above is the meat of this dispute and is addressed more fully below.

4. The Basis for Ms. Veneziano's Diagnosis

The heart of Ms. Veneziano's testimony as an expert social worker is that Plaintiff suffers, or suffered four years ago, from post-traumatic stress disorder as a result of her treatment at the hands of Defendant. Ms. Veneziano explicitly bases that diagnosis on the standards set forth in the DSM IV,

which is a recognized diagnostic text. Those standards require, for a diagnosis of post-traumatic stress disorder, that "the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others." Ms. Veneziano paraphrased those requirements when she stated that Plaintiff "was subjected to events which compromised her physical integrity and which threatened serious injury." Her conclusion in that regard is expressly based on four events, however, only two of which will be in evidence.

Ms. Veneziano cites (1) the requirement that Plaintiff enter a dangerous machine to fix it without sufficient instruction; (2) the inappropriate grabbing and squeezing by an instructor from another company; (3) the slashing of Plaintiff's tires; and (4) racial epithets. The first event is not alleged to have been racially motivated and will not be the subject of evidence at trial. The second event did not involve Defendant or its employees and is unrelated to Plaintiff's racial discrimination and retaliation claims. Those two incidents present much stronger arguments in favor of the "physical integrity" and "serious injury" requirements of the post-traumatic stress disorder diagnosis. The remaining two incidents, the tire-slashing and the use of racial epithets, do not present an obvious threat to physical integrity or threat of

11

serious injury.  In short, they do not independently support the diagnosis.

5.  <u>The Applicable Standards</u>

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  "The inquiry envisioned by Rule 702 . . . is a flexible one." <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 594 (1993), and it "should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." <u>Morales v. American Honda Motor Co.</u>, 151 F.3d 500, 516 (6th Cir. 1008).  "In determining whether a witness qualifies as an expert, a judge looks at the reasoning or methodology employed by the expert, whether the reasoning or methodology has been tested or subjected to peer review, the known rate of error if one can be determined, and may also consider whether the reasoning or methodology has been generally accepted within the relevant professional community." <u>In re Valley Vulcan Mold Co.</u>, 5 Fed. Appx. 396, 399 (6th Cir. 2001)(citing <u>Daubert</u>, 509 U.S. at 593-95).  <u>Daubert</u>'s list of factors is not definitive and "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999).

The trial court's gate-keeping function includes " a preliminary inquiry as to whether the reasoning or methodology underlying the testimony is scientifically valid." Conwood Co. L.P. v. U.S. Tobacco Co., 290 F.3d 768, 792 (6th Cir. 2002). The Daubert factors, especially the peer review and known rate of error factors, are not always entirely applicable to non-scientific expert testimony. See Kumho Tire, 526 U.S. at 149-52. The fundamental objective when considering the admissibility of expert testimony is "to ensure the reliability and relevancy" of the testimony. Id. at 152. See also First Tennessee Bank National Ass'n v. Barreto, 268 F.3d 319, 334-35 (6th Cir. 2001).

6. Application and Conclusion

In this case, the use of the DSM IV as a scientifically reliable source is not in question. The reliability of Ms. Veneziano's opinion based upon that source is at issue, however, because, stripped of the events that are not related to Plaintiff's claims, the opinion is not supported by the authority upon which Ms. Veneziano relies. Her testimony that Plaintiff suffers, or has suffered, from post-traumatic stress disorder may be in accordance with the text, but the causes for that disorder appear to be, in large measure, other than race discrimination and retaliation.

Plaintiff contends that the reliance upon erroneous facts affects the weight, not the admissibility, of the testimony. The Court of Appeals has suggested that the fact that an expert opines upon erroneous facts perceived or learned before trial does not necessarily render the opinion inadmissible. See Skidmore v. Precision Printing and Packaging, Inc., 188 F.3d 606, 618 (6th Cir. 1999). In such a case, the witness "may be required to disclose the underlying facts upon which [s]he relied." Id. The jury can then assess the reliability of the data and the opinion.

The remaining issue, however, is whether an expert may be permitted to testify to a diagnosis that is clearly based, in whole or in substantial part, upon events that are not actionable. At oral argument, Plaintiff's counsel proposed that the expert be permitted to state the diagnosis without testifying as to all of the underlying bases. That suggestion deviates from the sanctioned method for dealing with expert testimony based upon erroneous factual assumptions. See Skidmore, supra. While the bases for Ms. Veneziano's opinion may be factual, they are, nevertheless, erroneous to the extent that the expert has assumed that each of the four bases is relevant to Plaintiff's claims in this case. They are not, and the expert's testimony or implication that the actions by Defendant of which Plaintiff complains caused Plaintiff's PTSD would be inaccurate, causing

the jury to be confused and misled. The testimony does not, therefore, satisfy the requirements of Rule 702. See <u>Kumho Tire Co.</u>, 526 U.S. at 152. Defendant's motion to exclude Ms. Veneziano's testimony (Doc. 68) is, therefore, **GRANTED**.

    **IT IS SO ORDERED.**

                                                                   Sandra S. Beckwith
                                                                   United States District Judge